**THE BUFFALO EVENING NEWS, INC., Plaintiff,**

v.

**UNITED STATES BORDER PATROL, Defendant.**

**No. 89–CV–595S.**

United States District Court, W.D. New York.

April 11, 1992.

Andrea R. Polvino, Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., for plaintiff.

Dennis C. Vacco, U.S. Atty. by Donald P. Simet, Asst. U.S. Atty., Buffalo, N.Y., for defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Now before this Court are opposing motions for summary judgment of the plaintiff The Buffalo Evening News, Inc. ("the News") and defendant United States Border Patrol ("USBP"), pursuant to Fed. R.Civ.P. 56.

The News brought suit under the Freedom Of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq.*, challenging the USBP's nondisclosure of information which the News sought pursuant to a request for information under the FOIA. In connection with its investigation of the USBP's apprehen-

sion and reporting of excludable nonresident aliens found within United States borders in the Buffalo area, the News sought all Forms I–213 (the "Form(s)") completed by the USBP from June to August 1988. A Form is an internal form document used nationwide by the USBP and is completed by the USBP upon the apprehension or identification of aliens believed to be illegally in the United States.

In response to the News' request, the USBP released in excess of two hundred fifty (250) Forms, each representing a separate alien, virtually all containing redacted information pursuant to three different exemptions from disclosure contained in the FOIA. Based on the Forms provided to this Court, and the USBP's representation, the redactions were uniformly and consistently applied to all the released documents.

Pursuant to 5 U.S.C. §§ 552(a)(4)(B) & 552(a)(6), this Court has jurisdiction of this appeal from the USBP's FOIA determination and reviews the USBP's FOIA determination *de novo*.

Both parties now move for summary judgment. For the reasons set forth below, this Court denies the News' motion and grants the USBP's motion.

## FACTS

The following material facts are not in dispute.

By letter dated September 15, 1988, addressed to the United States Immigration and Naturalization Service ("INS"), Robert McCarthy ("McCarthy"), a reporter for the News, pursuant to the FOIA, sought ".... copies of all I–213 forms submitted by the Buffalo Sector Headquarters office and the Watertown Station of the U.S. Border Patrol for the months of June, July and August 1988." (Dickman, exh. A1; McCarthy, ¶ 8). According to McCarthy, the FOIA request stemmed from his investigation of a possible "secret policy" of the USBP Buffalo Sector to inflate or enhance its law enforcement statistics. (McCarthy, ¶¶ 5–8).

By letter dated September 22, 1988, the INS informed McCarthy that records responsive to his request were located with the United States Border Patrol, Tonawanda, New York and that McCarthy's request would be forwarded to that office. (Dickman, exh. A2).

Subsequently, by letter dated November 16, 1988 signed by Chief Patrol Agent William F. Dickman ("Dickman"), the USBP released fourteen pages (14) in their entirety and two hundred sixty nine (269) pages containing redacted information. The redactions prevented disclosure of 23 items or blocks of information on each Form. The USBP relied on three express exemptions from disclosure in support of the redactions: 5 U.S.C. § 552(b)(2) ("Exemption 2"); 5 U.S.C. § 552(b)(7)(C) ("Exemption (7)(C)") and 5 U.S.C. § 552(b)(7)(D) ("Exemption (7)(D)"). In defense of this lawsuit, the USBP has raised an additional exemption, 5 U.S.C. § 552(b)(7)(E) ("Exemption (7)(E)").

By letter dated December 19, 1988, addressed to the Office of Information and Privacy, United States Department of Justice, the News appealed the USBP's decision. (Complaint, exh. B). By letter dated December 23, 1988, the Department of Justice acknowledged receipt of the appeal and notified the News that the processing of the appeal would be delayed due to a backlog of pending FOIA appeals. (Complaint, exh. C).

After no further correspondence from the Department of Justice, the News filed this lawsuit. Both parties have filed motions for summary judgment, arguing that as a matter of law, disclosure or nondisclosure, as the case may be, is mandated by the FOIA.

## SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is upon the moving party to demonstrate the absence of a material factual dispute. Fed.R.Civ.P. 56(e). Once that burden is met, the non-moving party "must set forth specific facts showing that

there is a genuine issue for trial." Fed. R.Civ.P. 56(e). This Court must draw all reasonable inferences in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). However, courts should not be reluctant to grant summary judgment in appropriate cases since "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), thereby permitting courts to avoid "protracted, expensive and harassing trials." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Applying this standard to this case, this Court concludes that the News' motion must be denied and the USBP's motion must be granted.

## DISCUSSION

### 1. *The FOIA Generally*

The principle underlying the FOIA is "'to open agency action to the light of public scrutiny' ... by requiring agencies to adhere to a 'general philosophy of full agency disclosure.'" *Department of Justice v. Tax Analysts*, 492 U.S. 136, 141, 109 S.Ct. 2841, 2846, 106 L.Ed.2d 112 (1989) (citations omitted). Accordingly, on public request made pursuant to the FOIA, federal agencies must disclose records and related materials in their possession unless the FOIA specifically exempts disclosure.

■ Pursuant to 5 U.S.C. § 552(a)(4)(B), on judicial review of an agency's nondisclosure, such as here, the agency has the burden of demonstrating the applicability of a claimed exemption. An agency may sustain its burden of proof as to the applicability of a claimed exemption by submission of a *Vaughn* index [1] which

describe[s] with reasonable specificity the nature of the documents at issue and

the claimed justification for nondisclosure, and that indicate[s] the requested material logically comes within the claimed exemption.

*Malizia v. U.S. Department of Justice*, 519 F.Supp. 338, 342 (S.D.N.Y.1981); *See King v. U.S. Department of Justice*, 830 F.2d 210, 224 (D.C.Cir.1987). In this case, the USBP has submitted the *Vaughn* index of Dickman, a USBP Chief Patrol Agent for the Buffalo Sector. In order to facilitate this Court's review of the USBP's action, this Court required the USBP to submit a chart (the "Chart") briefly describing each withheld item of information keyed to the exemption(s) claimed and cross-referenced to the relevant portions of the Dickman affidavit.

### 2. *Information Withheld And The Claimed Exemptions*

The USBP withheld information from the News based on four FOIA exemptions. Some information has been withheld pursuant to more than one exemption. This Court now addresses each claimed exemption in turn.

#### A. Exemption 2

Exemption 2 exempts from disclosure matters "related solely to the internal personnel rules and practices of an agency...."

According to the Chart, the USBP redacted the following information on the Forms pursuant to Exemption 2: a) Block 1A, a "soundex" encoding of the alien's family name (Dickman, ¶ 9); b) Block 19, a short description of the method of apprehension (Dickman, ¶ 14); c) Block 45, the fact of whether the USBP listed an alien in the USBP Lookout Book (Dickman, ¶ 19); d) Block 46, code words used by the USBP to identify deportability charges (Dickman, ¶ 20); e) Block 49, portions of a narrative by a USBP agent explaining circumstances of apprehension, including statements by the alien and informants and names of third parties associated with the investiga-

---

**1.** Stemming from *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), a *Vaughn* index is "an affidavit by a federal agency furnishing the Court with enough information to determine the validity of a claimed [FOIA] exemption." *John Doe Corp. v. John Doe Agency*, 850 F.2d 105, 107, n. 1. (2d Cir.1988).

tion (Dickman, ¶ 22); f) Block 51, information concerning internal routing within the USBP (Dickman, ¶ 24); and g) Block 53, a statement of the ultimate disposition of the case (Dickman, ¶ 26). Most of this information was also withheld pursuant to other exemptions, which this Court also addresses below.

In a series of decisions the District of Columbia Circuit has articulated an instructive two step approach to judging the propriety of an agency withholding pursuant to Exemption 2.

■ First, as a threshold matter, this Court must determine whether the material redacted pursuant to Exemption 2 relates solely to the agency's *internal* rules and practices. Exemption 2's internality requirement "plainly limits the exemption to those rules and practices that affect the internal workings of an agency[,]" and, therefore, would be of no genuine public interest. *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1056 (D.C.Cir.1981) (en banc). Striking a reasonable balance between the seemingly contradictory language of Exemption 2, the District of Columbia Circuit has framed the internality inquiry as whether the matters claimed exempt relate "predominantly" to internal agency rules and practices. The Court commented:

> The qualifier 'predominant' arose out of a recognition that if the word 'solely' (in the phrase 'related solely') were interpreted literally and absolutely, exemption 2 would cover nothing at all. As Judge Leventhal wrote in a separate concurrence in *Vaughn v. Rosen*, 523 F.2d 1136, 1150–51 (D.C.Cir.1975), 'there are few events ... that occur without so much as a tiny ripple effect outside their area of prime impact.' On the other hand, to disregard 'solely' would make the exemption all encompassing.

*Schwaner v. Department of Air Force*, 898 F.2d 793, 795 (D.C.Cir.1990). Additionally, information need not constitute "rules and practices" in the traditional sense to

fall within the coverage of Exemption 2, but need only be related to them such that they "bear upon, or cast light upon ..." those rules or practices. *Schwaner*, 898 F.2d at 796 (and citations therein).

■ Initially, this Court finds that the information withheld pursuant to Exemption 2 is predominantly internal and relates to the USBP's personnel rules and practices and, therefore, fits within the statutory language of Exemption 2.

The News argues that this information is not predominantly internal because it "goes to the heart of the *public's* activities." (News memo., p. 21) (emphasis supplied). This Court rejects this notion. Any agency practice, particularly where the agency's activities involve public surveillance such as the USBP's law enforcement activities here, to some extent pertains to the public's activities. Moreover, to the extent the News is arguing that its allegations or "evidence" of agency misconduct elevate an otherwise internal matter to a public matter, this Court does not find this principle to be applicable here, as discussed more fully below.

Furthermore, although the Forms do not neatly fit into the ambit of "personnel rules and practices," they are investigative records solely for the internal use of the USBP. They are created solely in the process of the USBP's interdiction activities and as such are related to the agency's principal practice. (*See* Dickman, ¶¶ 4–6).

■ Second, so long as the withheld information fits within Exemption 2's statutory language, as here, it may be properly withheld pursuant to Exemption 2 if it meets either of two tests: 1) where it relates to trivial administrative matters of no genuine public interest; or should there exist a public interest in disclosure,[2] or 2) where the government demonstrates that disclosure of the material would risk circumvention of lawful agency regulations. *Founding Church of Scientology, Washington, D.C. v. Smith*, 721 F.2d 828, 829, n.

---

**2.** Where the material is internal and relates to an agency rule or practice, it will by definition be of no public interest.

4 (D.C.Cir.1983) (citations omitted); *Schwaner,* 898 F.2d at 794.

Initially, this Court concludes that items a, c, d, e and f, above, constitute matters not subject to a genuine and significant public interest, and, therefore, were properly withheld pursuant to Exemption 2.[3]

 Block 1A is an internal code for the alien's family name. According to Dickman, *inter alia,* the disclosure of these codes over a period of time could lead to the possibility that one familiar with certain patterns could "break" the code (Dickman, ¶ 9). This Court can perceive no legitimate countervailing public interest in knowing the codes.

The same holds true for Blocks 46 and 49. Block 46 contains other code words which the USBP uses to identify deportability charges. (*See* Dickman, ¶ 20). Block 49, contains a narrative by a USBP agent concerning the apprehension, including statements by the alien and informants and the names of third parties associated with the investigation. The USBP redacted several portions of Block 49, based on four different exemptions. Pursuant to Exemption 2, the USBP redacted codes or similar type words which serve to identify the alien and particular law enforcement methods employed in the apprehension. (Dickman, ¶ 22).[4]

 Block 45 contains information regarding whether the USBP listed the subject alien in its Lookout Book. As can be gleaned from the Dickman affidavit, The Lookout Book is purely an internal tool used by the USBP in its apprehension activities. (Dickman, ¶ 19). As such, this Court similarly finds it to constitute information trivial to the public interest and properly withheld pursuant to Exemption 2.[5] This

Court notes that in *Lawyers Committee For Human Rights v. I.N.S.,* 721 F.Supp. 552, 571 (S.D.N.Y.1989), that Court observed that the "public has a great interest in knowing who has been listed in [an I.N.S.] Lookout Book on the basis of the 'ideological exclusion provisions'" contained in 8 U.S.C. §§ 1182(a)(27)–(29). There is not a hint that the ideological exclusion provisions are involved in this case. Moreover, although in the context of Exemption 7(C) and not Exemption 2, the *Lawyers Committee* Court declined to order disclosure of the identities of individuals listed in the Lookout Book.

 Finally, Block 51 contains information on the internal routing of the Forms within the USBP. (Dickman, ¶ 24). This is also purely an administrative matter and of no genuine public interest.

 With respect to all these redactions, the News does not attempt to demonstrate a public interest in knowing the USBP's internal codes and procedures in general. Instead, the News argues that certain matters which may on their face appear trivial to the public interest are "anything but trivial given the substance of the allegations of wrongdoing." In other words, the News seems to argue, because the USBP is allegedly engaged in wrongdoing "from the top down ..." otherwise trivial or routine matters become important to the public interest. (News memo., p. 19). However, even if the News' proposition were correct, as discussed fully below in connection with the USBP's Exemption 7(C) redactions, this Court finds that mere allegations of wrongdoing will not defeat an otherwise valid statutory exemption from disclosure. Moreover, this Court believes insufficient evidence of wrongdoing by the USBP ex-

---

3. The USBP asserts that items a, d and f relate to trivial matters of no genuine public interest while disclosure of items b, c, e and g would risk circumvention of the law. (USBP memo., p. 8.) On the other hand, plaintiff appears to argue that items c, f and g arguably relate to trivial matters and only items b and e might qualify as information which would risk circumvention of the law. (News memo., p. 18). This Court disagrees to an extent with both characterizations.

4. The USBP also properly withheld this portion of Block 49 pursuant to Exemption 7(C), discussed below.

5. This Court also finds that the USBP properly redacted Block 45 pursuant to Exemption (7)(E), which the USBP also claims in support of this nondisclosure.

ists which would override any of the claimed exemptions.

■ With respect to item b, above, this Court concludes that, although not trivial, even if the public has an interest in its dissemination, disclosure would risk circumvention of agency regulation. Block 19 is a short description of the method of apprehension. (Dickman, ¶ 14). Although the Forms are not an internal manual, *per se*, they are generated solely for the USBP's use and reflect its methods of interdiction. This Court believes that this information would clearly disclose the USBP's techniques for apprehending excludable aliens. *See Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544 (2d Cir.1978). Therefore, this Court finds Block 19 properly withheld pursuant to Exemption 2.[6]

■ Item g, above, presents the most difficulty for this Court. Block 53, is a statement of the ultimate disposition of the case. According to Dickman, the disclosure of this information would reveal the prosecution practices of the USBP and the United States Attorney toward certain categories of cases. According to Dickman, once this information were made public, "the person predisposed to commit an immigration violation or other criminal offense would be made aware of the possible consequences (or lack thereof) for the contemplated behavior," presumably aiding that person to know that certain illegal behavior could or might escape prosecution. (Dickman, ¶ 24). Believing this information not to be merely trivial to the public interest, this Court must determine whether the USBP has shown that disclosure of the information would risk circumvention of lawful agency regulations. This Court believes that it has. The USBP need not show actual circumvention of its lawful agency regulation but risk of circumvention. Here, each case disposition, which is initially within the administrative discretion

of the USBP, is tailored to the factual scenario presented by the apprehension. This Court believes that disclosure would risk circumvention of the USBP's regulation by enabling would be violators to hone in on particular types of violations. Therefore, this Court finds Block 53 properly withheld pursuant to Exemption 2.[7]

### B. Exemption Seven

5 U.S.C. § 552(b)(7) ("Exemption 7") generally exempts from disclosure "records or information compiled for law enforcement purposes ..." to the extent that the government demonstrates that disclosure would fall within six delineated categories. In this case, the USBP claims that the disclosure of certain information which it withheld would fall within three categories, delineated at (b)(7)(C), (b)(7)(D) and (b)(7)(E).

As a threshold matter, this Court addresses the News' contention that the Forms do not constitute "records or information compiled for law enforcement purposes" therefore obviating any further exploration of the Exemption 7 withholding.

#### i. *Are The Forms Records Or Information Compiled For Law Enforcement Purposes?*

■ The District of Columbia Circuit has established an accepted two prong test to determine whether a law enforcement agency invoking Exemption 7 has shown that particular records have been compiled for law enforcement purposes.

First, the agency's "investigatory activities that give rise to the documents sought must be related to the enforcement of federal laws or to the maintenance of national security." To meet this requirement, the agency "should be able to identify a particular individual or a particular incident as the object of its investigation ... [and specify] ... the connection between that individual or incident and a possible security

---

6. This Court also finds Block 19 properly redacted pursuant to Exemption (b)(7)(E), which the USBP also claims.

7. In defending this lawsuit, the USBP raises Exemption 7(E) for the first time with respect to

items a, b, c, e & f, above, which this Court has held was properly withheld under Exemption 2. Other than where already specifically referred to, this Court need not and does not consider Exemption 7(E).

risk or violation of federal law." The purpose of this requirement is to "establish that the agency acted within its principal function of law enforcement, rather than merely engaging in a general monitoring of private individual's activities." *Pratt v. Webster*, 673 F.2d 408, 420–21 (D.C.Cir. 1982).[8]

Second, "the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least a 'colorable claim' of its rationality." With respect to this requirement, the Court observed that it is

> deferential to the particular problems of a criminal law enforcement agency. Such an agency, in order to carry out its functions, often must act upon unverified tips and suspicions based upon mere tidbits of information. A court, therefore, should be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision.

*Id.* at 421.

■■■ Addressing the first prong of *Pratt*, this Court concludes that the Forms stem from investigatory activities related to the USBP's enforcement of federal laws or to the maintenance of national security. According to Dickman, the Form "is a uniform document used nationwide by the Immigration & Naturalization Service for reporting and record keeping of the apprehensions of deportable aliens" and "executed immediately upon the apprehension or location of aliens illegally in the United States." They are not executed every time an immigration officer comes in contact with an alien, but "only for aliens who have been determined to be in the United States illegally." The Form "is the primary report of the investigating officer in a prosecution/deportation under Title 8 of the United States Code." (Dickman, ¶¶ 4–6.) As such, the USBP has demonstrated the connection between apprehending aliens illegally in the United States and a violation of federal law.

Addressing the second prong of *Pratt*, this Court concludes that it is met. Agreeing with the USBP's emphasis that the Forms are prepared for "each alien who is apprehended and who is either deported, who voluntarily departs the country, or who is held for criminal prosecution" (Dickman, ¶ 4–6). This Court concludes that the Forms are generated in the course of the USBP's investigations of the violation of federal immigration law.

The News argues that evidence exists showing that the information contained on the Forms is not rationally related to a legitimate investigation of the violation of federal laws or national security. Specifically, that "the sworn testimony of Kerry Painter, a former USBP agent terminated for misconduct, and others ..." demonstrate that while the Forms appear to establish a colorable claim of rationality, "the purpose underlying [their creation] bears little relationship to the USBP's law enforcement responsibilities." (News memo., p. 27.) The essence of the News' position is that Painter's termination and testimony at a hearing on appeal of his termination is evidence that the USBP may have falsified the substance of the information on the Forms "to enhance the enforcement statistics of the USBP for the Buffalo region." (*Id.*) Specifically, the News argues that, *inter alia*, "substantial questions exists [sic] as to whether the aliens were, in fact, 'deportable' or even 'detained', as that term is used for immigration purposes...." (*Id.*)

Essentially, then, while the News argues or at least suggests that the Forms were falsely made and, therefore, the USBP cannot demonstrate the rationality of its investigatory activities, the USBP vehemently disputes that it has engaged in any falsifi-

**8.** In 1986, Congress amended exemption 7 which, prior to the amendment, required a threshold showing that the documents withheld were "investigatory records compiled for law enforcement purposes...." Although *Pratt* was decided in 1982, Courts have found the first prong of the *Pratt* test unaltered by the amendment. *See, e.g., Keys v. U.S. Department of Justice*, 830 F.2d 337, 340 (D.C.Cir.1987); *Lawyer's Committee For Human Rights v. I.N.S.*, 721 F.Supp. 552, 563–64 (S.D.N.Y.1989).

cation or other wrongdoing. The USBP emphasizes that once it discovered that Painter engaged in misconduct it terminated Painter as an agent.

This type of problem was briefly addressed in *Shaw v. F.B.I.*, 749 F.2d 58 (D.C.Cir.1984). In that case, the District of Columbia Circuit observed that "the mere existence of a plausible criminal investigatory reason to investigate would not protect the files of an inquiry explicitly conducted, for example, for purposes of harassment." In other words, the agency cannot claim proper investigatory purpose as a pretext for ultra vires or illegal activity. The nexus claimed by the agency must be "unrefuted by persuasive evidence that in fact another, nonqualifying reason prompted the investigation. In other words, it shifts the burden of production to the plaintiff." *Id.* at 63. *See Carter v. U.S. Department of Commerce*, 830 F.2d 388, 393 (D.C.Cir.1987) (absent tangible evidence of the agency's bad faith, the Court should not "question the veracity of agency submissions."). Here, the only concrete evidence which the News offers to support its claim that the USBP falsified information is the fact that the USBP terminated Agent Painter for falsifying information on the Forms. Dickman, as Chief Patrol Agent, placed Painter on administrative leave and later terminated him after concluding that Painter falsified Forms beginning in approximately "early 1988." (Moore affidavit, exhs. C, H).

The News also offers what can at most be characterized as circumstantial evidence in the form of testimony given by other USBP agents during the November 14, 1989, hearing convened by the Merit Systems Protection Board in response to an appeal by Painter of his termination. At that hearing, USBP Agent William C. Spencer, Jr. testified that it was implied that there was pressure on agents in the Buffalo USBP office to obtain high numbers of apprehensions. (Moore affidavit, exh. D). Painter and another agent, Crocitto, also testified that USBP agents wanted high numbers of apprehensions to look

good. (Moore affidavit, exhs. F, H). Agent Patrick Norton testified that from time to time superiors asked him to expand the intelligence narrative on the Forms.

■ The News argues that the fact that the USBP terminated Painter for falsifying information on the Forms combined with this hearing testimony "is persuasive evidence that there was a non-qualifying reason for the generation of the facially regular Forms sufficient to overcome the presumption that the information was gathered for legitimate law enforcement or investigatory purposes." (Moore affidavit, ¶ 28). This Court disagrees. It is true that the USBP terminated Painter for falsifying information on the Forms. At most, this is evidence that one USBP agent was terminated for falsifying information. That alone does not suggest that such misconduct is prevalent or even existent amongst other USBP agents. Moreover, that at the Painter hearing other agents testified that they felt pressure to report excludable aliens does not reasonably tend to show that they manufactured or falsified information on Forms which they completed, or which were completed as a result of their investigations. This Court does not view any of the testimony at the Painter hearing to constitute sufficient evidence of government wrongdoing to trump the facially valid Exemption 7 withholdings.

Finally, the News offers three additional arguments, all of which this Court rejects. First, the News argues that the unredacted portions of the Forms indicate that the stops "were entirely fortuitous, arising either out of some other law enforcement activities (e.g. traffic or boating violations) or out of surreptitious entries which trigger USBP detection services." (News memo, p. 28). The News misconstrues the nature of the USBP investigatory activities. Dickman's testimony before the Merit Systems Protection Board on the Painter appeal indicates that the USBP used a variety of surveillance oriented means to conduct its investigations of illegal aliens, which were often times spot field investigations. Dickman testified that

A border patrol agent in the Buffalo sector has a mission to enforce the immigration laws, primarily between the ports of entry, and roughly out from the border about a hundred miles. They do this through various means. They conduct line watch operations, responding to sensors on railroad bridges. They observe traffic. They egress roads from the border. They work transportation facilities, such as the airport, bus station and train terminal. And they conduct liaison with other agencies.

(Moore affidavit, exh. C).

Second, the News argues that no evidence exists that the aliens described on the Forms were under the USBP's investigatory surveillance or prosecutorial activity. (News memo., p. 28). Where an agency's principal function is criminal law enforcement, as is the case with the USBP, this Court defers to the agency's claim that its external investigations are for law enforcement purposes. *Stern v. F.B.I.*, 737 F.2d 84, 88 (D.C.Cir.1984). As already noted, the USBP's surveillance activity is a field operation mostly conducted through observation. Moreover, the USBP need not show that its investigation "led to, or will lead to adjudicative or enforcement proceedings." *Id.* at 89 (and citations therein).

Third, the News argues that the Forms are generated by the USBP in the ordinary course of its business because "a form must be completed for each 'apprehension,' regardless of its outcome." (News memo., p. 28). Therefore, the News argues, the forms are not investigatory. It is true that the USBP generates the Forms in the regular course of its business. It is also true that the regular course of its business is to investigate the entry of illegal aliens in this country pursuant to federal law. As noted above, the Forms are only generated upon apprehension of aliens determined to be illegally in the United States. They are closely linked to the USBP's investigatory activity.

Therefore, finding that the USBP has established the facial applicability of Exemption 7, this Court now addresses the specific categories of Exemption 7 withholdings claimed by the USBP.

ii. *Exemption 7(C)*

5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)") exempts from disclosure "records or information compiled for law enforcement purposes," but only to the extent that their production "could reasonably be expected to constitute an unwarranted invasion of personal privacy...."

According to the Chart, the government redacted the following information from the Forms pursuant to Exemption 7(C): a) Block 1, the apprehended alien's name (Dickman, ¶ 8); b) Block 7, the apprehended alien's passport number (Dickman, ¶ 10); c) Block 8, the apprehended alien's current file number (Dickman, ¶ 11); d) Block 12, the apprehended alien's address in the United States (Dickman, ¶ 12); e) Block 13, the apprehended alien's permanent foreign address (Dickman, ¶ 13); f) Block 28, the name of the USBP agent apprehending the alien (Dickman, ¶ 15); g) Block 29, the apprehended alien's visa identification (Dickman, ¶ 16); h) Blocks 30 & 34, the apprehended alien's social security identification (Dickman, ¶ 18); i) Blocks 39, 41 & 42, the names and addresses of the apprehended alien's spouse and/or parents (Dickman, ¶ 18); j) Block 47, the name and address of the apprehended alien's United States employer (Dickman, ¶ 21); k) Block 49, portions of a narrative describing the apprehension, specifically words or codes identifying the alien or persons associated with the investigation (Dickman, ¶ 22); l) Block 50, the name of the USBP agent completing the Form (Dickman, ¶¶ 15 & 23); m) Block 52, the name of the apprehending USBP agent (Dickman, ¶¶ 15 & 25); and n) Block 54, name of USBP agent who reviewed the reports (forms) (Dickman, ¶ 25, 27).

To determine the propriety of the USBP's redactions pursuant to Exemption 7(C), this Court must weigh the claimed personal privacy interests supporting nondisclosure against the public's interest in the disclosure of the information. *United States Department of Justice v. Reporters*

*Committee,* 489 U.S. 749, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1989).

In redacting information from the Forms pursuant to Exemption 7(C), the USBP has identified several privacy interests which it claims justify nondisclosure of the information. They are the privacy interests of law enforcement officers, the subject "excludable" aliens and their families, and of third parties arising in connection with the USBP's investigation.

This Court will address these privacy interests in turn. However, preliminarily, it is instructive to consult the Supreme Court's thorough discussion of Exemption 7(C) in *Reporters Committee.* In that case, the Supreme Court held that the FBI properly withheld from disclosure pursuant to Exemption 7(C) "rap sheets," essentially criminal records compiled by the FBI and containing descriptive public information regarding an individual believed to be involved in public corruption. In so holding, the Court concluded that no countervailing public interest in favor of disclosure of the rap sheets outweighed a significant privacy interest implicated by the rap sheets. The Court explored the nature of a public interest which might justify an invasion of an identified personal privacy interest. Emphasizing that "whether an invasion of privacy is *warranted* cannot turn on the purposes for which the request for information is made." The Court instead commented that

> whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to 'the basic purpose of the Freedom of Information Act' to open agency action to the light of public scrutiny. ... Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose.

*Id.* 109 S.Ct. at 1481 (quoting *Department of the Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976) (further citations omitted). On the other hand, protection of the citizenry's right to be informed of official government conduct

"is not fostered by disclosure of information about private citizens that ... reveals little or nothing about an agency's own conduct." *Reporters Committee,* 109 S.Ct. at 1481.

The Court observed that in the case before it "—and presumably in the typical case in which one private citizen is seeking information about another—the requester, does not intend to discover anything about the conduct of the agency that has possession of the requested records." In those cases, it is inappropriate to order a government agency to release the information sought. *See Landano v. United States Department of Justice,* 956 F.2d 422, (3d Cir.1992) ("Only when the information requested reflects directly upon the way that the agency conducts business has the requester placed something on the public interest side of the balancing equation.")

Based on the principles discussed in *Reporters Committee,* the issue here is whether the redacted portions of the Forms sought by the News reveal information about the USBP's conduct or procedures which might prompt this Court to compel disclosure, or whether the redacted portions simply reveal information about private citizens and not about the agency's conduct.

This Court has carefully scrutinized the random sample of the Forms which the USBP disclosed to the News with redacted portions, attached as Exhibit A to the McCarthy affidavit. This Court was not presented with all the Forms but believes, based on its own review and the USBP's representation, that the redactions on these forms, which indeed are identical from Form to Form in this sample, are representative. (*See* Dickman, ¶ 7).

 On their face, all of the items redacted pursuant to Exemption 7(C) contain information about private citizens: the alien's family and given name (Block 1); the alien's passport number, visa identification, USBP file number, social security number and United States and foreign addresses (Blocks 7, 8, 12, 13, 29, 30, 34); the names of the apprehending agent, the agent completing the form and the review-

ing agent. (Blocks 28, 50, 52 & 54); the names and addresses of the alien's spouse or parents (Blocks 39, 41 & 42); the name and address of the alien's United States employer (Block 47); and portions of a narrative by the USBP agent explaining circumstances of apprehension, limited to the names either of the apprehended alien or third parties arising in connection with the investigation, their addresses or similar personal identifying information about either, such as, for example, a vehicle tag number. (Block 49).[9]

This Court does not find that disclosure of the withheld information *alone* would reasonably shed light on the USBP's conduct. The only information redacted pursuant to Exemption 7(C) is the information which is purely personal in nature, as described above. Conversely, left unredacted on the Forms is information concerning the circumstances of apprehension, information which can reasonably inform the public of the USBP's operations. The essence of the News' claim with respect to each item of withheld information pursuant to Exemption 7(C) is that disclosure of this purely personal information is necessary to test the veracity of the USBP's conduct. Presumably, the News intends to contact the aliens, their families or those third parties mentioned in furtherance of its investigation of the USBP's activities. (*See* News memo., p. 32). This Court believes that the *only* purpose which the disclosure of the redacted information could serve is to lead to a possible confrontation with the aliens, their families or third parties, or simply to make their identities known to the public.

Aliens, their families and other third parties mentioned in connection with USBP investigations have a strong privacy interest in nondisclosure of their names, addresses and other information which could lead to revelation of their identities. Several Courts have agreed with this general proposition because disclosure of this personal identifying information could lead to rumor, personal embarrassment or other damage to these individuals. *See Lesar v.*

*Department of Justice*, 636 F.2d 472, 488 (D.C.Cir.1980); *Lawyers Committee*, 721 F.Supp. at 565 (" 'It is generally recognized that the mention of an individual's name in a law enforcement file will engender comment and speculation and carry a stigmatizing connotation.' ") (quoting *Branch v. FBI*, 658 F.Supp. 204, 229 (D.D.C.1987)). This Court concludes that the privacy interests of the aliens, their families and third parties arising in connection with the investigations—in this case—outweigh any public interest served by release of this information. This Court rejects the News' proposition that aliens have no privacy interests in the FOIA context. *See, e.g., Lawyers Committee*, 721 F.Supp. at 571. This Court also rejects the News' contention that because a small percentage of apprehensions reflected on the Forms resulted in a "recommendation of prosecution," there is "little or no room for 'derogatory inferences' or embarrassment ..." to the apprehended aliens not prosecuted. (News memo., p. 30). The stigma emanating from being subject to or associated with a criminal investigation can be just as great, and the threat of retribution in the country of origin can be just as real as actual prosecution.

This Court similarly concludes that the USBP properly withheld the identities of USBP personnel associated with these investigations. As have several other courts in other cases, this Court finds that the withholding of the identities of law enforcement personnel to protect their privacy interests at stake outweighs any public interest in disclosure here. *See Nix v. United States*, 572 F.2d 998, 1006 (4th Cir.1978); *Lawyers Committee*, 721 F.Supp. at 565 ("Public identification of FBI agents could subject them to embarrassment and harassment in both their official duties and in their private lives.") (and citations therein).

For the most part, the News does not dispute that ordinarily the privacy interests of the type claimed by the USBP here are strong. The thrust of the News' position, attempting to distinguish these cases, is

---

**9.** This Court has already found these portions of Block 49 properly withheld pursuant to Exemp- tion 2.

that where there are questions about the veracity of a law enforcement officer's conduct, as the News argues exist in this case, the public interest in uncovering misconduct and the truthfulness of agency action overrides any personal privacy interest, mandating in favor of disclosure. According to the News, this is not the typical Exemption 7(C) case discussed in *Reporters Committee* because the very purpose for which it seeks this information is to exercise a citizen's right "to be informed about 'what their government is up to.'" *Reporters Committee*, 109 S.Ct. at 1481.

This Court recognizes that the News contends that disclosure is necessary so the public can investigate claims of USBP wrongdoing. However, a mere allegation of government misconduct is not enough to circumvent an otherwise facially proper exemption. Otherwise, a requesting party disappointed with a response to its FOIA inquiry could avoid the statutory exemptions to disclosure by raising the specter of government misconduct.

Finding the *Vaughn* index of Dickman a proper government affidavit submitted in support of the claimed exemptions, including Exemption 7(C), this Court presumes the veracity of the USBP's representations regarding its own conduct absent reliable contradictory evidence of a sufficient degree to offset this presumption. This Court has already discussed the sufficiency of evidence of USBP misconduct and concluded that there is an insufficient degree of reliable evidence indicating any existing impropriety at the USBP. Thus, there is insufficient evidence of misconduct to elevate a public interest above the strong privacy interests involved.

In support of its position that at least the names of the aliens should be released, the News relies on *Lawyer's Committee For Human Rights v. I.N.S.*, 721 F.Supp. 552 (S.D.N.Y.1989). In *Lawyer's Committee*, the plaintiffs sought judicial review, *inter alia*, of the decision of the United States

INS to withhold from disclosure information pertaining to the exclusion from the United States of a Colombian journalist and also to the general process by which the federal government decides to exclude nonresident aliens.

The government excluded the journalist pursuant to 8 U.S.C. §§ 1182(a)(26)–(28), which provide generally that the United States may exclude from admission into its borders individuals affiliated with various subversive groups, including the Communist Party. The exclusion of the journalist initially stemmed from the fact that her name was listed in the INS's National Automated Lookout System ("NAILS") Service Lookout Book, which identifies specific aliens whom the U.S. government believes are excludable, including individuals suspected of belonging to subversive groups. *Id.* at 555. Pursuant to the FOIA, in addition to information concerning the journalist, the plaintiffs sought information pertaining to the operation and procedures and maintenance of the NAILS, including the names of those individuals listed in the NAILS Lookout Book. The INS responded to the plaintiffs' request with respect to the operations and maintenance of NAILS, withholding documents in their entirety based on several FOIA provisions, including exemption 7(C).

On review, the Court, reversing the INS in part, ordered a limited disclosure of some of the information.[10] Specifically finding the public interest in disclosure strong and observing that "the very purpose of the plaintiffs' request is to gain information about the manner in which Government agencies decide to exclude aliens, particularly when ideological grounds are involved[,]" the Court required the INS to release the occupations and countries of origin of those aliens listed as excludable in the NAILS Lookout Book and the statutory bases for excluding those aliens. Concomitantly finding the alien's privacy interests strong, the Court declined to order release of the individual's identi-

---

**10.** The Court also ordered an *in camera* inspection of some INS documents and found some of the claimed exemptions proper.

ties for fear of reprisals against them in their home countries "if it were learned that the American government suspects them of being affiliated with terrorist organizations." *Id.* at 571.

The present case differs from *Lawyer's Committee* in a critical respect and, therefore, it is unnecessary to engineer a similar compromise for a limited disclosure. In that case, the Court specifically found disclosure "likely to shed light on the conduct of Government agencies." *Id.* at 571. This Court agrees that disclosure of the statutory basis for excluding a certain alien based on ideological grounds, combined with disclosure of the alien's occupation and country of origin, enables the public to assess much about the government's practice and policy toward ideological exclusion. This Court also agrees with *Lawyer's Committee* that disclosure of the identities of the excludable aliens, while arguably in some instances enriching to the public's knowledge of agency practice, for example, where a notorious individual is deemed excludable, does not add much to the public's ability to know what the government is "up to," at least not enough to outweigh the countervailing privacy interests at stake. In this case, however, as this Court has already found, disclosure of the purely personal information redacted pursuant to Exemption 7(C) would not shed much light on agency practice to any degree sufficient to outweigh the strong privacy interests involved.

Although in this case this Court cannot now identify the same palpable threat of retribution against the aliens in their country of origin as in *Lawyer's Committee,* the prospect of invasion of personal privacy is still quite strong. *See Reporters Committee,* 109 S.Ct. at 1477–78 (various provisions in FOIA exempting from disclosure of personal information reflects "a congressional understanding that disclosure of records containing personal details about private citizens can infringe significant privacy interests.")

### iii. *Exemption 7(D)*

5 U.S.C. § 552(b)(7)(D) ("Exemption 7(D)") exempts from disclosure "records or information compiled for law enforcement purposes," but only to the extent that their production "could reasonably be expected to disclose the identity of a confidential source...."

■ According to the chart, pursuant to Exemption 7(D) the government redacted portions of Block 49, the narrative describing the apprehension, which reveal the identity of a confidential source. According to Dickman, the confidential source material withheld "includes the names of non-federal agencies, their employees, and, in some instances, the information provided by the confidential informant." The non-federal agencies are state or local law enforcement bodies which have exchanged information with the USBP. Dickman states that the disclosure of information from or identities of cooperating law enforcement agencies would discourage the beneficial exchange of such information in the future. (Dickman, ¶ 22). The thrust of Dickman's affidavit is that an implied assurance of confidentiality passed between the USBP and these other law enforcement agencies.

The News contends that where the confidential source contacted the USBP stemming from a legal obligation, the confidential source should be disclosed because "there can be no legitimate argument ... that the disclosure of the identity of the source will result in a chilling of any future offers of information." (News memo., p. 40).

■ This Court concludes that an implied assurance of confidentiality protects the identity of other law enforcement sources in this case and, therefore, that the USBP properly withheld the sources pursuant to Exemption 7(D). An agency asserting Exemption 7(D) need not show that the information was provided under an express agreement of confidentiality. According to FOIA's legislative history, an assurance of confidentiality may be reasonably inferred under the circumstances. *See Nix v. United States,* 572 F.2d 998, 1003 (4th Cir.1978). This Court does not believe the fact that the source of the information was another law enforcement agency means that Exemption 7(D) does not apply. The fact remains that the USBP acquired the information in connection with its law enforcement activities. The News has come forth with no evidence to indicate that confidentiality was not implicit or that the information was not obtained in connection with

the USBP's law enforcement activities. *See Schmerler v. F.B.I.,* 900 F.2d 333, 337 (D.C.Cir.1990) (presumption that law enforcement agency assures confidentiality to informants providing information in the course of a law enforcement investigation and burden remained on requester to rebut presumption).

### CONCLUSION

For the reasons set forth above, this Court denies the News' motion for summary judgment and grants the USBP's motion for summary judgment.

### ORDER

IT HEREBY IS ORDERED that this Court denies the motion of plaintiff for summary judgment, pursuant to Fed. R.Civ.P. 56.

FURTHER, that this Court grants the motion of defendant for summary judgment, pursuant to Fed.R.Civ.P. 56.

FURTHER, that this Court directs the Clerk of the United District Court for the Western District of New York to enter a final judgment for defendant, in accordance with this Decision.

SO ORDERED.