MARICOPA AUDUBON SOCIETY, a non-profit Arizona corporation, and Dr. Robin Silver, an individual, Plaintiffs,

v.

UNITED STATES FOREST SERVICE, Defendant.

Civ. No. 94–1244 JP/DJS.

United States District Court, D. New Mexico.

Aug. 16, 1995.

John W. Zavitz, Assistant U.S. Attorney, Albuquerque, NM, Jacqueline Becerra, U.S. Department of Justice, Washington, DC, for defendant.

Matthew G. Kenna, Durango, CO, for plaintiffs.

*MEMORANDUM OPINION AND ORDER*

PARKER, District Judge.

The subjects of this order are defendant's Motion for Summary Judgment (doc. # 7), filed March 22, 1995 and plaintiffs' Cross–Motion for Summary Judgment (doc. # 10), filed April 7, 1995. Having reviewed the parties' briefs and supporting documentation, I find there are no genuine issues of material fact and conclude that defendant's motion should be denied and that summary judgment should be granted in favor of plaintiffs.

## I. Background:

This lawsuit arises out of plaintiffs' request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") for management territory maps[1] used to protect the Mexican spotted owl on United States Forest Service ("Forest Service") lands in New Mexico and Arizona ("region 3"). The Forest Service refused to disclose the management territory maps arguing that the maps are exempt from disclosure under 5 U.S.C. § 552(b)(2) ("exemption 2").

The following facts are undisputed. On June 23, 1994, Dr. Robin D. Silver, on behalf of the Maricopa Audubon Society ("plaintiffs"), requested several documents pertaining to the Mexican spotted owl from the Forest Service under the FOIA. On July 8, 1994, Charles W. Cartwright, Jr., Regional Forester released a number of the documents to plaintiffs but denied the request for the Mexican spotted owl territory maps. On August 16, 1994, plaintiffs appealed the denial of the territory maps to Jack Ward Thomas, Chief of the Forest Service, but the Forest Service did not respond to plaintiffs' appeal. Subsequently, on October 28, 1994, plaintiffs filed this action seeking the release of all the management territory maps, without displaying the core areas,[2] for the Mexican spotted owls in region 3.

In 1993, the Mexican spotted owl was named as a threatened species under the Endangered Species Act.[3] Prior to the owl's listing, Regulation 2671.2 from the Forest Service Manual ("FSM") guided Forest Service personnel in responding to FOIA requests about proposed, endangered, and threatened species ("PET"). That regulation allowed the Forest Service to deny dissemination of information "if the release of such information would likely jeopardize or have a detrimental effect on recovery of the species. Personnel shall not identify specific location information that could jeopardize the welfare of a threatened, endangered, proposed or sensitive species." FSM Reg. 2671.2. Regional Forester David Jolly stated that in applying FSM Regulation 2671.2 to permit the release of information on sensitive species under the FOIA, "Valid requests for sensitive information to conduct legitimate studies or research can be accommodated by obtaining a signed statement from the individual conducting the studies which states the location of such sites will not be divulged to others not directly involved in conducting the studies." August 30, 1989 letter to Forest Supervisors.

Defendant explained that Forester Jolly's statement "refers to the Forest Service's policy of releasing information in conjunction with granting a permit to conduct a *legitimate study* on lands managed by the Forest Service." According to defendant, legitimate studies required a permit. Consequently, defendant argued that "[t]his policy is wholly inapplicable and irrelevant to a release under the FOIA." Defendant's reply brief at 21. However, the explicitly stated "Subject" of the August 30, 1989 letter was "Release of Information on Sensitive Species under Freedom of Information Act (FOIA)". Furthermore, in the August 30, 1989 letter, Forester Jolly discussed how to apply FSM Regulation 2671.2 to requests under the FOIA. Although Forester Jolly used the phrase "legitimate studies or research" in the letter, he did not specify in the letter that a requesting party had to have a permit before a study would be considered legitimate.

---

1. "A management territory is an area, designated by the Forest Service, around a confirmed or inferred sighting of a single or a pair of Mexican spotted owls in which certain activities are prohibited or monitored in order to protect and conserve the Mexican spotted owl and its habitat." Defendants' Memorandum, Statement of Material Facts 1A. In 1994, there were 841 management territories in New Mexico and Arizona. Management territories contain a minimum of 2,000 acres. Forest Service Interim Directive No. 2, June 26, 1990. Interim Directive No. 2 prohibits or limits activities in the management territory, such as road building, timbering and drilling that would disturb or change the Mexican spotted owl's habitat.

2. Each management territory has at least one core area which is a 450 acre area surrounding the nest or roost site.

3. Plaintiffs note that Dr. Silver was the person who submitted to the U.S. Fish and Wildlife Service the petition to list the Mexican spotted owl as an endangered species that lead to the owl's listing. 58 F.R. 14,252 (March 16, 1993).

I also note that when plaintiffs requested the information concerning the Mexican spotted owl on June 23, 1994, they submitted a three and one-half page letter outlining why they desired the information. In their June 23, 1994 letter to the Forest Service, plaintiffs stated that the requested information would be used primarily to give the general public an understanding of the controversy surrounding the Mexican spotted owl. Additionally, plaintiffs explained that they planned to independently analyze the effects of the timber harvest program on the Mexican spotted owl.

Defendant denied plaintiffs' request for the management territory maps because the Forest Service's previous biological evaluation had shown that the maps contained information more specific than that recommended for release. The biological evaluation, conducted after the owl was listed as a threatened species, determined that identification of a territory generally described as a 5,000 to 10,000 acre area would not harm the owl. The biological evaluation noted that more precise information, such as a management territory map, could reveal locations of nest stands which might increase the likelihood of malfeasance. On May 26, 1993, the Department of Interior concurred with the Forest Service's conclusion that the release of more specific information than a 5,000 to 10,000 acre area could harm the Mexican spotted owl.

Defendant explained, and plaintiffs do not dispute, that someone who possesses a management territory map could easily locate a Mexican spotted owl and its nest. Furthermore, because protection of the Mexican spotted owl is controversial, it is likely that some individuals might threaten or harm the owl. Even though plaintiffs agree that the core areas should be redacted from the maps, it would not be difficult to locate a core area with a management territory map because the core area is usually found in the center of the map.

Based on these facts, defendant argues that its motion for summary judgment should be granted because management territory maps for the Mexican spotted owls are exempt from disclosure under the FOIA. Plaintiffs assert that the exemption is inapplicable and, therefore, that summary judgment should be granted in their favor.

## II. Cross-motions for summary judgment:

### A. *Legal Standard for Summary Judgment:*

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to " 'secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, as well as any affidavits, "show that there is no genuine issue as to any material fact ..." Fed. R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States,* 590 F.2d 884, 887 (10th Cir.1979), the burden on the moving party may be discharged by demonstrating the absence of evidence to support the non-moving party's case. *Celotex, supra* at 324, 106 S.Ct. at 2553. In such a situation, the moving party is entitled to judgment as a matter of law, "because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322, 106 S.Ct. at 2552.

### B. *The FOIA and the Applicability of FOIA Exemptions:*

"The predominant objective of FOIA is disclosure. Congress enacted FOIA to en-

sure that the public has access to government information so that it can scrutinize the government's performance of its statutory duties and thereby promote governmental honesty." *Hale v. U.S. Dept. of Justice,* 973 F.2d 894, 897 (10th Cir.1992) (citing *EPA v. Mink,* 410 U.S. 73, 79–80, 93 S.Ct. 827, 832–33, 35 L.Ed.2d 119 (1973), *vacated on other grounds,* 509 U.S. 918, 113 S.Ct. 3029, 125 L.Ed.2d 717 (1993) (Mem.)); *see also Dept. of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976) (FOIA's purpose is "to open agency action to the light of public scrutiny").

▮ The public's right to government information is not without limits. Section 552(b) of the FOIA delineates nine categories of information that are exempt from compelled disclosure. The exemptions are to be "narrowly construed," *Rose,* 425 U.S. at 361, 96 S.Ct. at 1599, and the burden is on the government agency "to demonstrate ... that the materials sought may be withheld due to an exemption." *Vaughn v. United States,* 936 F.2d 862, 866 (6th Cir.1991) (*citing* 5 U.S.C. § 552(a)(4)(B)). A federal court reviews *de novo* an agency's decision to withhold records requested under the FOIA. *See* 5 U.S.C. § 552(a)(4)(B).

C. *Exemption 2:*

In this case, defendant invokes the exemption set forth in 5 U.S.C. § 552(b)(2) which protects from disclosure information that is "related solely to the internal personnel rules and practices of an agency." [4] In interpreting exemption 2, the Supreme Court, in *Rose,* reasoned that "at least where the situation is not one where disclosure may risk circumvention of agency regulation, Exemption 2 is not applicable to matters subject to such a genuine and significant public interest. . . .

Rather, the general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest." *Rose,* 425 U.S. at 369–70, 96 S.Ct. at 1603. Although the scope of exemption 2 has been "hotly contested," *Dirksen v. U.S. Dept. of Health & Human Services,* 803 F.2d 1456, 1458 (9th Cir.1986), the Tenth Circuit has not yet provided any clear guidance on its interpretation.[5] Defendant contends, and plaintiffs agree, that a majority of the Circuit Courts of Appeal have interpreted the language of exemption 2 to encompass two types of information: (1) internal matters of a relatively trivial or mundane nature, i.e., rules as to personnel's use of parking facilities, regulations of lunch hours, and statements of sick leave policy, *see* S.Rep. No. 813, 89th Cong., 1st Sess. 3, 8 (1965), and (2) more substantial internal matters, the disclosure of which would allow circumvention of a statute or agency regulation, i.e., rules, guidelines, and manuals of procedure for government investigators, *see* H.R.Rep. No. 1497, 89th Cong.2d Sess., 5 (1966), U.S.Code Cong. & Admin.News 1966 pp. 2418, 2427. The latter is typically referred to as the "high 2" exemption.

It is clear that the management territory maps do not fall within the first type of information encompassed by exemption 2. Defendant does not argue that management territory maps are trivial administrative information. Only the high 2 exemption might apply to justify nondisclosure.

The District of Columbia Circuit created a two-part test for determining what type of

---

**4.** "Exemption 2 is traceable to congressional dissatisfaction with the exemption from disclosure under former § 3 of the Administrative Procedure Act of 'any matter relating solely to the internal management of an agency.' The sweep of that wording led to agencies withholding from disclosure matter 'rang[ing] from the important to the insignificant.'" *Rose,* 425 U.S. at 362, 96 S.Ct. at 1600 (citations omitted).

**5.** In *Hale,* the Tenth Circuit exempted certain information compiled for law enforcement purposes concluding that the information was trivial administrative matter of no genuine public interest. 973 F.2d at 902. In dicta, the Tenth Circuit recognized that exemption 2 could also encompass "more substantial matters that might be the subject of legitimate public interest if the disclosure of the latter might pose a risk of circumvention of lawful agency regulations." (*citing Rose,* 425 U.S. at 365–67, 96 S.Ct. at 1601–02). However, the Supreme Court vacated the *Hale* decision on other grounds. 509 U.S. 918, 113 S.Ct. 3029, 125 L.Ed.2d 717 (1993).

information should be protected from disclosure under the high 2 exemption. *Schwaner v. Dept. of the Air Force,* 898 F.2d 793, 794 (D.C.Cir.1990); *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, 1074 (D.C.Cir.1981) (en banc). "First, the material should fall within the terms of the statutory language." *Schwaner,* 898 F.2d at 794 (quoting *Founding Church of Scientology v. Smith,* 721 F.2d 828, 830 n. 4 (D.C.Cir. 1983)). However, the requested material need not constitute "rules and practices" per se; rather, it merely needs to bear upon, or cast light upon an agency's rules and practices. *Id.* at 796. The court in *Crooker* framed this initial test as one of "predominant internality." 670 F.2d at 1074. In other words, the material need not relate "solely" to rules and practices even though the statutory language of exemption 2 uses the language "solely." *Vaughn v. Rosen,* 523 F.2d 1136, 1150–51 (D.C.Cir.1975) (Leventhal, J., concurring). If the requested material fits within the statutory language, the inquiry progresses to whether the government can show that disclosure might risk circumvention of agency regulation. *Schwaner,* 898 F.2d at 794; *see Rose,* 425 U.S. at 369, 96 S.Ct. at 1603. The agency may avoid disclosure if both the statutory language and the regulation circumvention risk components of the test are satisfied.

There appear to be no reported decisions in which a federal court has analyzed whether factual material pertaining to a threatened or endangered species, such as maps, should be withheld under exemption 2 of the FOIA. Instead, courts have more frequently applied and analyzed exemption 2 with respect to agency handbooks and manuals or to "a rule or practice in the most literal sense." *Schwaner,* 898 F.2d at 795; *see, e.g., United States v. FLRA,* 510 U.S. 487, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1990) (employee addresses); *Jones v. F.B.I.,* 41 F.3d 238 (6th Cir.1994) (FBI documents gathered for law enforcement purposes); *Beckette v. U.S. Postal Service,* Civ. A. No. 90–1246–N, 1993 WL 730711 (E.D.Va. March 11, 1993) (postal service control files for personnel grievances); *Massey v. F.B.I.,* 3 F.3d 620 (2d Cir.1993) (FBI murder investigative reports); *Schwaner,* 898 F.2d 793 (D.C.Cir.1990) (names and address-es of Air Force Base employees); *Kaganove v. EPA,* 856 F.2d 884 (7th Cir.1988) (employee promotion rating plans), *cert. denied,* 488 U.S. 1011, 109 S.Ct. 798, 102 L.Ed.2d 789 (1989); *NTEU v. U.S. Customs Service,* 802 F.2d 525 (D.C.Cir.1986) (rules for evaluating job applicants); *Dirksen v. Dept. of Health & Human Serv.,* 803 F.2d 1456 (9th Cir.1986) (internal processing guidelines for medicare claims); *Founding Church of Scientology of Washington, D.C., Inc. v. Smith,* 721 F.2d 828 (D.C.Cir.1983) (portions of FBI documents); *Crooker,* 670 F.2d 1051 (D.C.Cir. 1981) (agent training manual); *Hardy v. Bureau of Alcohol, Tobacco & Firearms,* 631 F.2d 653 (9th Cir.1980) ("raids and searches" manual); *Cox v. Dept. of Justice,* 601 F.2d 1 (D.C.Cir.1979) (marshal's manual), *overruled on other grounds by Benavides v. Bureau of Prisons,* 993 F.2d 257 (D.C.Cir.1993); *Caplan v. Bureau of Alcohol, Tobacco & Firearms,* 587 F.2d 544 (2d Cir.1978) (Bureau of Alcohol, Tobacco & Firearms pamphlet regarding raids and searches); *Hawkes v. I.R.S.,* 467 F.2d 787 (6th Cir.1972) (IRS handbooks and manuals); *Sanders v. United States Dept. of Justice,* 1992 WL 97785 (D.Kan.1992) (internal computer codes used by FBI); *Buffalo Evening News, Inc. v. United States Border Patrol,* 791 F.Supp. 386 (W.D.N.Y.1992) (internal immigration forms completed by U.S. Border Patrol).

### (1) Defendant's Position:

Defendant argues that the high 2 interpretation of exemption 2 applies and that the management maps are "predominantly internal" agency documents because Forest Service personnel use the maps in fulfilling their responsibilities of protecting the owl. Furthermore, the maps assist the Forest Service in ensuring that certain activities take place without harming the owl and facilitate the Forest Service's enforcement of statutes that protect the owl. To disclose the maps would "significantly risk circumvention" of existing statutes and agency regulations that protect the Mexican spotted owl, i.e., the Endangered Species Act, the Multiple–Use Sustained–Yield Act, and the Federal Land Policy and Management Act. In addition, releasing the maps would under-

mine the very purpose of creating the maps which was to protect the owls.

## (2) Plaintiffs' Position:

Plaintiffs contend that the high 2 interpretation of exemption 2 is an improper limitation of the FOIA disclosure requirements which the Tenth Circuit Court of Appeals will not follow. Plaintiffs argue that the only proper test for nondisclosure under exemption 2 should be triviality or mundanity of the internal information. Alternatively, plaintiffs argue that even if the high 2 interpretation is valid, exemption 2 is inapposite because the maps do not "bear an adequate relation to any rule or practice" of the Forest Service, see Schwaner, 898 F.2d at 794, the maps are not "predominantly internal," and the release of the maps to plaintiffs alone, under a confidentiality agreement, would not risk circumvention of law or regulation.

### D.  Analysis:

█ I decline to speculate on whether the Tenth Circuit Court of Appeals would adopt the high 2 interpretation of exemption 2. Instead, I conclude that even under a high 2 analysis, defendant has failed to demonstrate that exemption 2 shields the management territory maps from disclosure. Here, the management territory maps do not appear to fall within the terms of the statutory language of exemption 2, and they do not relate predominantly to the Forest Service's internal agency rules and practices. It is too much of a stretch to say that management territory maps of Mexican spotted owls' habitats "bear or cast light" on the Forest Service's rules and practices. See Schwaner, 898 F.2d at 796. Defendant points out that it is now well-settled that law enforcement training manuals may be withheld under the high 2 interpretation of exemption 2. See Crooker, 670 F.2d at 1073; Hardy v. Bureau of Alcohol, Tobacco & Firearms, 631 F.2d at 653, 656 (9th Cir.1980). However, instructions to law enforcement agents do not appear to be remotely similar to management territory maps. Likewise, guidelines used to process medicare applications, see Dirksen v. Health & Human Services, 803 F.2d 1456, 1458 (9th Cir.1986), or employee hiring plans, see National Treasury Employees Union v. United States Customs Service, 802 F.2d 525, 528 (D.C.Cir.1986), are not analogous to maps of the habitats of an endangered or threatened species.

Defendant also asserts that the maps are "predominantly internal" because the maps are created to assist Forest Service personnel in their duties. That argument is not convincing because it is reasonable to conclude that virtually all written material that the Forest Service publishes would at least to some extent assist its employees in their work. Moreover, the court in Crooker stated that the word "internal" in exemption 2 "plainly limits the exemption to those rules and practices that affect the internal workings of an agency. 'Related solely to' limits the exemption to those matters that are truly internal, and not of legitimate public interest." 670 F.2d at 1056. Here, while defendant argues that management territory maps are predominantly internal, defendant does not appear to suggest that the maps lack legitimate public interest.

Because I decide that the management territory maps are not sufficiently related to the agency's rules and practices and are not "predominantly internal," I do not reach the question of whether disclosure of the maps would circumvent a regulation or statute or undermine the purpose of the maps. I recognize that the crux of the Forest Service's argument is that disclosure of the maps "will increase the risk of circumvention of, if not defeat the purpose behind, the statutes, regulations, and the management territory maps themselves, all of which protect the Mexican spotted owl." [6] Defendant's responsive brief at 17. However, the Forest Service has not satisfied the threshold test by demonstrating that the material withheld falls within the statutory language of exemption 2 or of predominant internality. See Schwaner, 898

---

**6.** I also note my concern that disclosure of the management territory maps could provide the locations of the Mexican spotted owls to individuals who wish to harm the owls. However, I cannot assume that persons would use the Freedom of Information Act to gain information for the purpose of enabling them to violate the law. Also, despite my concern, it does not appear that Congress intended to withhold this type of material under exemption 2 of the FOIA.

F.2d at 794, 798 (court did not reach the second step of exemption 2 analysis because the government did not meet the threshold test); *Founding Church of Scientology,* 721 F.2d at 830 n. 4 (agency must first show that the material withheld fell within the terms of the statutory language); *Crooker,* 670 F.2d at 1074 (exemption 2 applies when the information in question meets the test of predominant internality *and* if disclosure significantly risks circumvention of agency regulations or statutes) (emphasis added); *Church of Scientology of Texas v. I.R.S.,* 816 F.Supp. 1138, 1148 (W.D.Tex.1993) (the threshold test of predominant internality must be met before examining the second prong of the test).

■ Plaintiffs have stated that they would be willing to enter into a confidentiality agreement with defendant and not reveal the information on the maps to anyone except the persons specified in the confidentiality agreement. To ensure protection of the Mexican spotted owl, plaintiffs should execute the agreement before defendant discloses the information to plaintiffs. I note, however, that this proposed confidentiality agreement should not restrict the government from disclosing the management territory maps to others who may submit proper requests under the FOIA. The FOIA is not intended to provide documents to certain individuals while withholding the same information from other persons. The purpose of the FOIA is "to inform the public about agency action." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 143 n. 10, 95 S.Ct. 1504, 1513 n. 10, 44 L.Ed.2d 29 (1975).

E. *Violation of the FOIA:*

■ Plaintiffs also seek a declaration that defendant violated the FOIA by failing to respond to plaintiffs' administrative appeal within twenty working days as required by 5 U.S.C. § 552(a)(6)(A)(ii). I decline to make such a ruling. The time limit provisions embodied in § 552(a)(6)(A)(ii) were "intended to promote a timely agency response and contribute to the faster release of the information sought." *Taylor v. Appleton,* 30 F.3d 1365, 1368 (11th Cir.1994). However, a twenty day wait did not slow the process significantly. Furthermore, · 5 U.S.C.

§ 552(a)(6)(C) provides that if the agency fails to comply with the applicable time limit provisions, it shall be deemed that the requesting party has exhausted his administrative remedies. The requesting party may then bring suit, as did the plaintiffs in this case.

IT IS THEREFORE ORDERED that:

(1) plaintiffs' motion for summary judgment is GRANTED and the management territory maps for the Mexican spotted owl in region 3 must be disclosed to plaintiffs no later than ten days after plaintiffs have executed the confidentiality agreement;

(2) defendant's motion for summary judgment is DENIED; and

(3) plaintiffs' motion for declaratory relief on the issue of whether defendant violated the FOIA is DENIED.