# United States Court of Appeals
## For the First Circuit

No. 13-1752

UNION LEADER CORPORATION,

Plaintiff, Appellant,

v.

U.S. DEPT. OF HOMELAND SECURITY,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella, Howard, and Thompson,
Circuit Judges.

Gregory V. Sullivan, with whom Malloy & Sullivan, Lawyers Professional Corporation was on brief, for appellant.
Michael McCormack, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

April 18, 2014

**HOWARD, Circuit Judge.**  In September 2011, as part of a nationwide enforcement operation, Immigration and Customs Enforcement (ICE) agents in New Hampshire arrested six aliens who had prior criminal convictions or arrests.  After ICE refused to divulge the names and addresses of these six individuals, the Union Leader -- a New Hampshire newspaper and the appellant in this case -- filed a Freedom of Information Act (FOIA) complaint to compel disclosure of this information.  The district court awarded summary judgment to ICE, concluding that FOIA exempted this personal information from disclosure as an unwarranted invasion of the arrested aliens' privacy.  Because we find that the public interest in disclosure outweighs the arrestees' privacy interests, we conclude that the withheld information that is subject to this appeal is not exempt from disclosure and therefore reverse the district court's grant of summary judgment in part.

## I.

In 2011, ICE (a division of the United States Department of Homeland Security (DHS)) conducted two nationwide "Cross Check" operations in an endeavor to arrest aliens with prior convictions or arrests, including "criminal fugitives; criminal aliens who illegally re-entered the United States after having been removed, and at large criminal aliens."  On September 28, 2011, ICE issued a press release detailing the 2,901 arrests made as part of the second Cross Check operation that month.  Among the arrests listed

-2-

in the press release were those made in each county of each New England state, including six arrests made in the state of New Hampshire.

The following month, the Union Leader contacted an ICE public affairs officer to request the names and addresses of the six individuals arrested in New Hampshire. The ICE officer replied with information including each arrestee's sex, age, nationality, state of arrest (i.e., New Hampshire), prior convictions, and ICE custody status, but did not provide the arrestees' names and addresses.

In February 2012, the Union Leader submitted a FOIA request to ICE, seeking production of "any and all records and documents relating to, and/or concerning the six individuals arrested" by ICE during the second Cross Check operation in New Hampshire.[1] ICE reviewed the request and found some nineteen pages of responsive documents, consisting of I-213 forms documenting the arrests of each of the six aliens apprehended in New Hampshire.[2]

---

[1]The Union Leader had previously filed a FOIA complaint in the District of New Hampshire, which the district court dismissed for failure to exhaust administrative remedies (i.e., the Union Leader's failure to file a formal FOIA request with ICE prior to filing suit). See Union Leader Corp. v. U.S. Dep't of Homeland Sec., Immigration & Customs Enforcement, No. 12-cv-18-JL, 2012 WL 1000333 (D.N.H. Mar. 23, 2012).

[2]An I-213 form documents the arrest of an alien unlawfully present in the United States. In addition to the circumstances of the arrest, the form contains the name, alien number, address, date of birth, photograph, fingerprints, criminal and immigration history, and other information about the arrestee.

In March 2012, ICE provided the Union Leader with copies of the forms from which the aliens' names, addresses, and other personal information had been redacted. In an accompanying "Vaughn index,"[3] ICE claimed that FOIA exempted this personal information from disclosure under Exemptions 6 and 7(C), 5 U.S.C. § 552(b)(6) & (7)(C).

The redacted I-213 forms outlined the criminal histories and arrest records of the six aliens. The forms revealed prior arrests and convictions dating as far back as 1993, including, inter alia, prior notice to appear (NTA) arrests and prior convictions for entry without inspection, shoplifting, possession of controlled substances, resisting arrest, criminal trespassing, and driving under the influence of drugs or liquor. According to the forms, three of the arrested aliens were processed and served with warrants of arrest and notices to appear (WA/NTA) for removal proceedings, while another was ordered removed by an immigration judge and placed in ICE custody pending removal; two others would be "NTA-processed and scheduled for a hearing before EOIR [the Executive Office for Immigration Review] at a later date."

---

[3]A Vaughn index is a "now standard tool conceived by the District of Columbia circuit to facilitate resolution of FOIA disputes," derived from the D.C. Circuit's decision in Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). Church of Scientology Int'l v. U.S. Dep't of Justice, 30 F.3d 224, 227 & n.4 (1st Cir. 1994). The index "includes a general description of each document sought by the FOIA requester and explains the agency's justification for nondisclosure of each individual document or portion of a document." Id. at 228.

The Union Leader administratively appealed ICE's decision to redact the arrestees' names and addresses. On March 28, 2012, the ICE Office of the Principal Legal Advisor, Government Information Law Division, responded to the Union Leader's appeal and affirmed ICE's decision to redact the names and addresses.

The Union Leader filed this lawsuit on April 4, 2012, alleging that ICE incorrectly applied FOIA Exemptions 6 and 7(C) and that FOIA gave the Union Leader a right of access to the redacted names and addresses. On cross motions for summary judgment, the district court granted ICE's motion for summary judgment on the ground that FOIA Exemption 7(C) protected the arrestees' names and addresses from disclosure. This appeal followed.

**II.**

On appeal, the Union Leader only challenges ICE's redaction of the arrestees' names, and no longer seeks production of their addresses or any other personal information. This distinctly narrower request might be viewed as substantively different than the broader one with which the district court was faced -- we do not know how the court would have ruled had it been presented only with the request that we consider on appeal -- but the issue is nevertheless preserved. In any event, we review de novo the district court's determination that the names were exempt from disclosure. See Carpenter v. U.S. Dep't of Justice, 470 F.3d

434, 437 (1st Cir. 2006); Church of Scientology Int'l v. U.S. Dep't of Justice, 30 F.3d 224, 228 (1st Cir. 1994).

The Supreme Court has stated that FOIA was "enacted to facilitate public access to Government documents" and "designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991) (citation omitted) (internal quotation marks omitted). FOIA's "basic policy of full agency disclosure" furthers the statute's essential purpose of permitting citizens to know "what their government is up to." U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989) (citation omitted) (internal quotation marks omitted); see also Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 171 (2004).

This right of access is not absolute, however, as FOIA exempts certain categories of materials from disclosure in order to "effectuate the goals of the FOIA while safeguarding the efficient administration of the government." Carpenter, 470 F.3d at 438; see also 5 U.S.C. § 552(b) (setting forth the statutory exemptions). Nevertheless, in keeping with FOIA's underlying presumption in favor of broad disclosure, the government agency bears the burden of proving the applicability of a specific statutory exemption. See Carpenter, 470 F.3d at 438; Church of Scientology, 30 F.3d at 228. "That burden remains with the agency when it seeks to justify

-6-

the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document." Ray, 502 U.S. at 173. The district court must determine de novo whether the agency has met this burden. See Reporters Comm., 489 U.S. at 755; Carpenter, 470 F.3d at 438; Church of Scientology, 30 F.3d at 228.

FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), shields from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."[4] In determining whether an invasion of personal privacy is "unwarranted," courts must balance the implicated privacy interest against the public interest in releasing the materials. Favish, 541 U.S. at 171; Reporters Comm., 489 U.S. at 762; see also Carpenter, 470 F.3d at 438. We address each interest in turn.

---

[4]Both ICE and the district court also recognized the potential applicability of FOIA Exemption 6, 5 U.S.C. § 552(b)(6), which protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Exemption 6 is less protective of personal privacy than Exemption 7(C), however, applying only to disclosures that "would constitute a clearly unwarranted invasion of personal privacy" rather than to disclosures that merely "could reasonably be expected to constitute an unwarranted invasion of personal privacy." See Favish, 541 U.S. at 165-66; Reporters Comm., 489 U.S. at 756. Because the parties do not dispute that the requested information was "compiled for law enforcement purposes," the district court analyzed the Union Leader's claim only under Exemption 7(C), Union Leader Corp. v. U.S. Dep't of Homeland Sec., Immigration & Customs Enforcement, 940 F. Supp. 2d 22, 27-28 (D.N.H. 2013), and we follow suit.

### A.      Arrestees' Privacy Interests

"FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny, not that information about private citizens that happens to be in the warehouse of the Government be so disclosed." Reporters Comm., 489 U.S. at 774.  Accordingly, in applying Exemption 7(C), the Court has rejected "cramped notion[s] of personal privacy," id. at 763, and instead has interpreted the exemption as "protect[ing] a broad notion of personal privacy, including an individual's interest in avoiding disclosure of personal matters," Carpenter, 470 F.3d at 438.  This privacy interest "is at its apex" in cases where the subject of the requested materials is a private citizen, Favish, 541 U.S. at 166 (quoting Reporters Comm., 489 U.S. at 780) (internal quotation marks omitted).  Notwithstanding these general principles, however, we have declined to "prescribe a formula for measuring the impact of the privacy invasion resulting from disclosure," and have instead described the privacy interest as a "variable" that "must be determined and weighed in light of the particular circumstances in each case."  Providence Journal Co. v. U.S. Dep't of Army, 981 F.2d 552, 569 (1st Cir. 1992).

On appeal, the Union Leader challenges the district court's conclusion that the arrestees had a cognizable privacy interest "in not having their identities revealed to the public"

and that this interest trumped the public interest in disclosure. <u>Union Leader Corp.</u> v. <u>U.S. Dep't of Homeland Sec., Immigration & Customs Enforcement</u>, 940 F. Supp. 2d 22, 28 (D.N.H. 2013).  We fully agree with the district court's conclusion that disclosure would indeed implicate the arrestees' privacy interests; our quibble is only with the weight that the district court gave that interest in the Exemption 7(C) balancing.

The Union Leader initially makes the categorical claim that "[n]o individual has a reasonable expectation of privacy regarding a public arrest by the government," relying on caselaw holding that "[n]o <u>constitutional</u> right of privacy is violated even by the disclosure 'of an official act such as an arrest.'" <u>Am. Fed'n of Gov't Emps.</u> v. <u>Dep't of Hous. & Urban Dev.</u>, 118 F.3d 786, 794 (D.C. Cir. 1997) (emphasis added) (quoting <u>Paul</u> v. <u>Davis</u>, 424 U.S. 693, 713 (1976)).  As the district court recognized, this reliance is misplaced, because "the statutory privacy right protected by Exemption 7(C) goes beyond the common law and the Constitution." <u>Favish</u>, 541 U.S. at 170; <u>see</u> <u>also</u> <u>Reporters Comm.</u>, 489 U.S. at 762 n.13 (specifically distinguishing <u>Paul</u> because "[t]he question of the statutory meaning of privacy under the FOIA is, of course, not the same as . . . the question whether an individual's interest in privacy is protected by the Constitution").  We therefore agree with the district court that "it is a mistake to assume, as the Union Leader does in this case,

-9-

that a ruling that the Constitution does not require the Government to <u>withhold</u> the name of an arrested person means that the government must <u>disclose</u> the same information under the FOIA." <u>Union Leader</u>, 940 F. Supp. 2d at 28.[5]

The Supreme Court's decision in <u>Reporters Committee</u> makes clear that the arrestees do indeed have a privacy interest concerning their underlying convictions and arrests. In holding that Exemption 7(C) barred the disclosure of an alleged organized crime figure's FBI "rap sheet," the <u>Reporters Committee</u> Court explained that disclosure would implicate the individual's privacy interest even though the underlying events of his criminal history were matters of public record:

> According to Webster's initial definition, information may be classified as "private" if it is "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public." Recognition of this attribute of a privacy interest supports the distinction, in terms of personal privacy, between scattered disclosure of the bits of information contained in a rap

---

[5]For similar reasons, we respectfully decline to rely on <u>Tennessean Newspaper, Inc.</u> v. <u>Levi</u>, 403 F. Supp. 1318, 1321 (M.D. Tenn. 1975), which the Union Leader cites for the proposition that privacy interests are insubstantial in the case of "persons arrested or indicted for federal criminal offenses." The <u>Tennessean</u> court reasoned that such individuals "are essentially public personages" whose lives "are no longer truly private"; in an accompanying footnote, it drew an analogy to "the public personage idea derived from the [privacy] tort cases." <u>Id.</u> at 1321 & n.1. We question the validity of that analogy in light of the Supreme Court's subsequent distinction of FOIA privacy interests from tort-law privacy interests in <u>Reporters Committee</u>, 489 U.S. at 762 n.13.

sheet and revelation of the rap sheet as a whole. The very fact that federal funds have been spent to prepare, index, and maintain these criminal-history files demonstrates that the individual items of information in the summaries would not otherwise be "freely available" either to the officials who have access to the underlying files or to the general public. Indeed, if the summaries were "freely available," there would be no reason to invoke the FOIA to obtain access to the information they contain. Granted, in many contexts the fact that information is not freely available is no reason to exempt that information from a statute generally requiring its dissemination. But the issue here is whether the compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information. Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information.

489 U.S. at 763-64. "In sum," the Court later concluded, "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." Id. at 770 (citation omitted) (internal quotation marks omitted).

Nevertheless, although the Reporters Committee Court recognized a privacy interest in an individual's criminal history, it did not have occasion to consider the strength of that privacy interest. Instead, the Court simply found no countervailing public interest, stating that the requesting party did not "intend to discover anything about the conduct of the agency that has

-11-

possession of the requested records" and that "disclosure would not shed any light on the conduct of any Government agency or official." Id. at 773 (emphasis added). Accordingly, the Court categorically held that a "request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no 'official information' about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is 'unwarranted.'" Id. at 780.

This case does not fall within that categorical holding, because, as we explain below, the Union Leader has identified a public interest in disclosure of the arrestees' names. We must therefore assess the strength of the arrestees' privacy interests in order to appropriately balance those interests against the public interest in disclosure. In so doing, we take our guidance from the Court's subsequent statement in Ray that "whether disclosure of a list of names is a significant or a de minimis threat [to privacy] depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue." 502 U.S. at 176 n.12 (citation omitted) (internal quotations omitted).

The Union Leader directs our attention to the Southern District of New York's decision in New York Times Co. v. U.S. Department of Homeland Security, 959 F. Supp. 2d 449 (S.D.N.Y.

2013), which found Exemption 7(C) inapplicable in circumstances roughly similar to those of this case. The New York Times and a reporter submitted a FOIA request to ICE, seeking production of "a list of all aliens since 2008 who, after being convicted of a crime and serving their sentence, were designated for removal but were released from DHS custody pursuant to Zadvydas [v. Davis, 533 U.S. 678 (2001)]." Id. at 450. After ICE provided a spreadsheet containing each alien's criminal convictions, date of release, and immigration status, the New York Times and the reporter filed suit to obtain the aliens' names, which ICE had redacted under Exemption 7(C). The Southern District of New York recognized that disclosure of the names would implicate a privacy interest under Reporters Committee -- specifically, "that of convicted criminals in not releasing in compiled form information which is already public" -- but found that interest "significantly diminished" given the public availability of the underlying information. Id. at 455.

We find the New York Times court's reasoning apposite, and we also note that The Buffalo Evening News, Inc. v. United States Border Patrol, 791 F. Supp. 386 (W.D.N.Y. 1992), a case cited by the district court and relied upon by ICE, is partly distinguishable in its analysis of the implicated privacy interest. Although Buffalo Evening News also involved a FOIA request for personal information redacted from I-213 forms detailing the apprehension of illegal aliens, the request was far broader in

-13-

scope than the Union Leader's, with the plaintiff newspaper seeking not only the apprehended aliens' names but also, inter alia, their addresses, passport and social security numbers, and the names and addresses of their spouses, parents, and employers.  Id. at 396. Moreover, the Buffalo Evening News court presumed that "the News intend[ed] to contact the aliens, their families or those third parties mentioned in furtherance of its investigation of the [United States Border Patrol]'s activities," raising the specter of "possible confrontation with the aliens, their families or third parties."  Id. at 398; see also New York Times, 959 F. Supp. 2d at 456 ("[P]laintiffs do not propose to contact the individuals in furtherance of their investigation -- a derivative use which the Second Circuit held 'dramatically increases the already significant threat to the privacy interests that disclosure of this information would entail.'" (citation omitted) (internal brackets omitted)). Here, as in New York Times, the Union Leader has stated that it has no intention of contacting the individuals, and that it only seeks to review the public records of their prior arrests and convictions.

We therefore conclude that although the arrestees have a cognizable privacy interest in their names, that interest is attenuated both by the status of their underlying convictions and arrests as matters of public record and by the limited nature of

the Union Leader's proposed investigation.  Having filled the first pan of the Exemption 7(C) scales, we now turn to the second.

### B.    Public Interest in Disclosure

In assessing whether the public interest in disclosure outweighs the arrestees' countervailing privacy interests and therefore warrants an invasion of their privacy, we must consider "the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny." Reporters Comm., 489 U.S. at 772 (citation omitted) (internal quotation marks omitted); see also Carpenter, 470 F.3d at 440.  That purpose is served by disclosure of "[o]fficial information that sheds light on an agency's performance of its statutory duties," but not "by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." Reporters Comm., 489 U.S. at 773; see also Carpenter, 470 F.3d at 440-41.

Accordingly, where Exemption 7(C) privacy concerns are implicated, the requesting party must show "[f]irst, . . . that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and "[s]econd, . . . [that] the information is likely to advance that interest." Favish, 541 U.S. at 172.  "Otherwise, the invasion of privacy is unwarranted." Id.  Moreover, where "the

-15-

public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure," and instead "must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." Id. at 174; see also Ray, 502 U.S. at 178-79; Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1115 (D.C. Cir. 2007).

In the Union Leader's estimation, "[t]he names of the [arrestees] are necessary in order for Union Leader to undertake the important and vital task of reviewing the performance of governmental actors and agencies, both federal and state." More specifically, the Union Leader claims that obtaining the names will enable it and the public "to monitor the processing of the [arrestees] by the agencies and courts responsible for immigration policy." For instance, in the case of one of the aliens, who was ordered removed by an immigration judge in 1988 and convicted of criminal trespassing in 1993, the Union Leader states that without this individual's name, it "cannot determine what communication, if any, was transmitted to or from ICE or any other state or federal agency, and what proceedings, if any, took place subsequent to that removal order in 1988" such that this alien still remained in New Hampshire 23 years later.

The Union Leader raised the same argument before the district court during a hearing on the parties' cross motions for summary judgment.[6]  In granting ICE's motion for summary judgment, the district court rejected the Union Leader's proffered "public interest" as based "entirely on speculation about what the public might learn if the names and addresses of the arrestees were disclosed" -- i.e., the possibility that "the public might be able to use the names and addresses to discover additional relevant information."  Union Leader, 940 F. Supp. 2d at 29.  The district court found this case controlled by the Supreme Court's holding in Ray, which rejected an asserted public interest based merely on "the hope that respondents, or others, may be able to use [the requested] information to obtain additional information outside the Government files" and concluded that "[m]ere speculation about hypothetical public benefits cannot outweigh a demonstrably

---

[6]ICE suggests that the Union Leader has proposed these specific uses for the arrestees' names for the first time on this appeal.  We disagree.  Although the Union Leader's appellate brief is more detailed insofar as it explains the importance of each individual arrestee's name, the Union Leader's argument before the district court was essentially identical to its argument on appeal. The Union Leader stated before the district court that the redacted documents revealed a "pattern of inefficiency . . . whereas these people have been . . . arrested and convicted over and over again here in New Hampshire over a ten year period" and posited that disclosure of the arrestees' names could "expose incompetence, inefficiency," enabling the Union Leader to discover why the individuals were "allowed to stay in the United States" for so long after their convictions.

significant invasion of privacy."  502 U.S. at 178-79; see also Favish, 541 U.S. at 174.[7]

In reaching this conclusion, the district court noted that it "join[ed] several other district courts that have upheld the redaction of identifying information from I-213 forms under Exception 7(C) of the FOIA." Union Leader, 940 F. Supp. 2d at 29-30 (citing Unidad Latina en Acción v. U.S. Dep't of Homeland Sec., 253 F.R.D. 44, 51 (D. Conn. 2008); Schiller v. Immigration & Naturalization Serv., 205 F. Supp. 2d 648, 664 (W.D. Tex. 2002); Buffalo Evening News, 791 F. Supp. at 400).  Each of these cases found an insufficient public interest to warrant an invasion of the apprehended aliens' privacy.  In Buffalo Evening News, which provides the most thorough and cogent analysis, the plaintiff newspaper contended that disclosure of the apprehended aliens' redacted personal information was "necessary to test the veracity of the [Border Patrol's] conduct."  791 F. Supp. at 398.  However, the plaintiff could point to no evidence of governmental misconduct or mendacity.  In keeping with Ray and Favish, the court found that this "mere allegation of government misconduct is not enough to circumvent an otherwise facially proper exemption," noting that

_____

[7]The Ray Court declined, however, to adopt a "categorical rule" altogether excluding such "derivative uses" from the public interest calculus, and relied simply on the fact that there was no evidence showing that the proposed derivative use "would produce any relevant information that is not set forth in the documents that have already been produced."  502 U.S. at 178-79.

-18-

"[o]therwise, a requesting party disappointed with a response to its FOIA inquiry could avoid the statutory exemptions to disclosure by raising the specter of government misconduct."  Id. at 399.

The Union Leader suggests that this case is closer to New York Times, where the district court found a sufficient public interest to warrant disclosure.  The plaintiffs in that case did not "assert a direct public interest in knowing the names of individuals being released" from DHS custody, but rather contended that the names would lead to additional information that "would shed further light on critical aspects of the government's handling of its removal duties," allowing the newspaper to "more fully monitor how often courts gave lesser sentences to aliens because prosecutors and judges mistakenly believed that removal was to follow sentence and how often DHS failed to seek longer detentions for individuals who, according to court records, posed a risk to the community."  959 F. Supp. 2d at 454-55 (internal brackets and quotation marks omitted).  In support of this argument, the plaintiffs pointed to several instances in which they were "able to learn through diligent reporting despite the secrecy imposed by DHS of several questionable exercises of DHS's discretion under Zadvydas."  Id. at 455 & n.44 (internal quotation marks omitted). In light of that evidence, the court concluded that the newspaper's allegations of governmental impropriety were based on more than "bare suspicion" (thereby satisfying Favish's requirement) and that

-19-

"disclosure of the names would further the legitimate public interest in knowing how government agencies make decisions." Id. at 456.

We believe that this case falls closer to New York Times than to Buffalo Evening News, and we therefore conclude that the district court gave inadequate weight to the public interest in disclosure. Like the New York Times, the Union Leader can point to "evidence that would warrant a belief by a reasonable person" that such negligence might have occurred: namely, the redacted I-213 forms ICE has already produced, which document the apprehension of aliens who had been convicted of crimes and/or ordered removed from the United States as long as 23 years before their 2011 arrests. Favish, 541 U.S. at 174. Although that delay is hardly conclusive evidence of negligence, or other wrongdoing on the part of ICE, we believe that it is at least enough to warrant a reasonable belief "that the alleged Government impropriety might have occurred." Id. (emphasis added).

Disclosure of the redacted names will enable the Union Leader to investigate public records pertaining to the arrestees' prior convictions and arrests, potentially bringing to light the reasons for ICE's apparent torpor in removing these aliens.[8] Cf.

_____

[8]We note, however, that reviewing the performance of state governmental entities is not a valid public purpose under FOIA, which "applies only to federal executive branch agencies." Philip Morris, Inc. v. Harshbarger, 122 F.3d 58, 83 (1st Cir. 1997); see also, e.g., Rimmer v. Holder, 700 F.3d 246, 258-59 (6th Cir. 2012)

Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice, No. 12-5223, 2014 WL 1284811, at *6 (D.C. Cir. Apr. 1, 2014) ("Disclosure of the records would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches."). The redacted names are therefore more than mere "information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." Reporters Comm., 489 U.S. at 773. Instead, their disclosure will forward the legitimate public interest in "knowing what [the] Government is up to," id. -- a public interest that ICE itself implicitly acknowledged in its issuance of a press release trumpeting the Operation Cross Check arrests. That public interest outweighs the arrestees' attenuated privacy interests in their underlying arrests and convictions, which are already matters of public record. We therefore hold that Exemption 7(C) is inapplicable in these circumstances.

---

("FOIA is concerned only with shedding light on misconduct of the federal government, not state governments. . . . [J]ust as there is no FOIA-recognized public interest in discovering evidence in federal government files of a private party's violation of the law, there is no FOIA-recognized public interest in discovering wrongdoing by a state agency." (citations omitted) (internal quotation marks omitted)). We therefore reject the Union Leader's argument that disclosure of the arrestees' names also serves a cognizable public interest in reviewing the performance of state courts and agencies.

## III.

For the foregoing reasons, we **reverse in part** the district court's order granting ICE's motion for summary judgment and remand for further proceedings consistent with this opinion.